IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| JACOB SANKEY and RENEE SANKEY, individually, and V.J.S., M.D.S, and J.S.S., by and through their parents and next friends,   JACOB SANKEY and RENEE SANKEY,<br><br>        Plaintiffs,<br><br>vs.<br><br>THE STATE OF IOWA, THE IOWA DEPARTMENT OF HEALTH AND HUMAN SERVICES, JOHNSON COUNTY, IOWA, KELLY GARCIA, PAIGE BREON, AMY HOWELL, LANE HARMS, KATY JAMES, MELISSA CLIFTON, PAIGE CASTEEL, MATT MAJESKI, and SARA LINDER in their individual and official capacities,<br><br>        Defendants. | CASE NO. 3:25-cv-00084<br><br>**COMPLAINT FOR:**<br><br>1) **MULTIETHNIC PLACEMENT ACT OF 1994, AS AMENDED BY THE INTERETHNIC ADOPTION PROVISIONS OF 1996, 42 U.S.C. §§ 671(A)(18), 674, 1983, 1996B;**<br><br>2) **42 U.S.C. § 1983 (EQUAL PROTECTION);**<br><br>3) **42 U.S.C. § 1983 (DUE PROCESS);**<br><br>4) **BREACH OF FIDUCIARY DUTY;**<br><br>5) **NEGLIGENCE; AND**<br><br>6) **DECLARATORY JUDGMENT AND INUNCTIVE RELIEF**<br><br>    **(JURY DEMANDED)** |

Plaintiffs, JACOB SANKEY, individually, RENEE SANKEY, individually, and

V.J.S., M.D.S, and J.S.S., by and through their parents,   JACOB SANKEY and

RENEE SANKEY, (collectively, "Plaintiffs"), bring this Complaint against

Defendants, the STATE OF IOWA, THE IOWA DEPARTMENT OF HEALTH AND

HUMAN SERVICES, JOHNSON COUNTY, IOWA, KELLY GARCIA, PAIGE
BREON, AMY HOWELL, LANE HARMS, KATY JAMES, MELISSA CLIFTON,
PAIGE CASTEEL, MATT MAJESKI, and SARA LINDER, in their individual and
official capacities, (collectively, "Defendants"), for damages and injunctive relief, and
in support thereof state as follows:

## JURISDICTION AND VENUE

1.      This is an action brought under the Multiethnic Placement Act of 1994
(MEPA), as amended by the Interethnic Adoption Provisions of 1996 (IEP), 42 U.S.C.
§§ 671(a)(18), 674, 1996b, and 42 U.S.C. § 1983.

2.      This Court has federal question subject matter jurisdiction pursuant to
28 U.S.C. § 3344 because the claims arise under the Constitution and statutes of the
United States.

3.      Venue is proper in this district under 28 U.S.C. § 1391(1)(b) and (c)
because a substantial part of the events or omissions giving rise to the claims occurred
in this district, the Defendants engaged in the actions alleged below in this district,
and the Defendants are subject to personal jurisdiction in this district.

## THE PLAINTIFFS

4.      Plaintiffs V.J.S., M.D.S, and J.S.S. (collectively, the Children) are the
adoptive children of Plaintiffs Jacob and Renee Sankey.

5.      Plaintiff Jacob Sankey ("Jake") is the adoptive father of the Children
and, prior to the adoption, was the great uncle of the Children.

6.      Plaintiff Renee Sankey ("Renee") is the adoptive mother of the Children
and, prior to the adoption, was the great aunt of the Children.

## THE DEFENDANTS

7.      The State of Iowa is a State of the United States.

8.      The Iowa Department of Health and Human Services (HHS) is an agency of the State of Iowa, responsible for guardianships and the adoption selection for children in foster care. HHS is subject to the requirements of the Multiethnic Placement Act of 1994 (MEPA), as amended by the Interethnic Adoption Provisions of 1996 (IEP), 42 U.S.C. §§ 671(a)(18), 674, 1996b.

9.      Johnson County, Iowa is a political subdivision of the State of Iowa.

10.     Kelly Garcia, in her individual and official capacities, was the director of HHS at all times material to this action and was responsible for developing, implementing, and overseeing the policies, customs, and practices pertaining to adoption selection process involving HHS.

11.     Paige Breon, in her individual and official capacities, is a resident of the State of Iowa. Defendant Breon was employed by HHS as the ongoing social worker during the Children's Child in Need of Assistance Case ("CINA") at all times material to this action.

12.     Amy Howell, in her individual and official capacities, is a resident of the State of Iowa. Defendant Howell was employed by HHS and was Defendant Breon's direct supervisor with the HHS at all times material to this action.

13.     Lane Harms, in his individual and official capacities, is a resident of the State of Iowa. Defendant Harms was employed by HHS as the adoption worker in Johnson County, Iowa who was involved in the adoption selection process of the Children at all times material to this action.

3

14.    Katy James, in her individual and official capacities, is a resident of the State of Iowa. Defendant James was employed by HHS as an adoption worker in Linn County, Iowa and was involved in the adoption selection process of the Children at all times material to this action.

15.    Melissa Clifton, in her individual and official capacities, is a resident of the State of Iowa. Defendant Clifton was employed by HHS as an adoption services supervisor and was involved in the adoption selection process of the Children at all times material to this action.

16.    Paige Casteel, in her individual and official capacities, is a resident of the State of Iowa. Defendant Casteel was employed by HHS as a Social Work Administrator and was the direct supervisor of Defendant Clifton and was involved in the adoption selection process of the Children at all times material to this action.

17.    Matt Majeski, in his individual and official capacities, is a resident of the State of Iowa. Defendant Majeski was employed by HHS as a Service Area Manager and was the direct supervisor of Defendant Casteel at all times material to this action.

18.    Sara Linder, in her individual and official capacities, is a resident of the State of Iowa. Defendant Linder was employed by Johnson County, Iowa as the designated guardian ad litem (GAL) for the Children at all times material to this action.

## FACTUAL BACKGROUND

19.    Diana and Josh Sankey adopted the Children's biological mother, Jayda Sankey ("Mother"), when she was 16 years old, although she came to live with them

when she was 15. The Mother had spent approximately 3,500 days in the foster care system. This constituted over half of the Mother's life.

20.     The Mother moved out of Diana and Josh's home on her 18th birthday. After that, she spent approximately 5 years in and out of prison and then split her time between Indiana and Iowa.

21.     On or about May 23, 2022, removal of the Children from the Mother was requested due to concerns regarding the care the Children received while in the Mother's care. At the time of removal, V.J.S. was seventeen months old and M.D.S. and J.S.S. were four months old.

22.     The Children were voluntarily placed by their Mother in the care of their material grandparents, Diana and Joshua Sankey in April 2022.

23.     At all times material to this action, Plaintiffs Jake and Renee Sankey spent considerable time with the Children and they had formed a close bond such that the Children had become a part of their family. Renee and Jake became licensed foster parents and participated in the training that licensure requires.

24.     The Children were adjudicated as children in need of assistance, and their biological parents' rights were terminated by order of the Court on or about May 2, 2023. The Children remained in placement with Diana and Joshua throughout the CINA case and after the parental rights of the Children's biological parents were terminated.

25.     After the Children's parents' rights were terminated, guardianship of the Children was transferred to the Iowa Department of Health and Human Services.

26. In addition, after the parental rights of the Children's biological parents were terminated, HHS formed an adoption selection committee ("Committee") for the Children to select an adoptive family for the Children.

27. Beginning in July 2022, the Children would spend 1–2 weeks each month with Plaintiffs Jake and Renee Sankey (the "Sankeys") and their children in LeClaire, Iowa. During these times, a close bond was formed, and the Sankeys expressed interest in adopting the Children.

28. Due to their close bond with the Children, the Sankeys applied to adopt the Children. Diana and Joshua did not pursue adoption of the Children because the Sankeys desired to adopt the Children and because of the close bond between the Children and the Sankeys.

29. E'Shaya Anderson and Mary Anderson (the "Andersons"), the maternal great aunts of the Children, also applied to adopt the Children. The Andersons are the sisters of the Mother's biological father. The Andersons lived in Indiana at all times material to this action.

30. The Andersons are African-American.

31. The Children are African-American.

32. The Sankeys are White/Caucasian.

33. Despite the close and personal bond between the Children and the Sankeys and the fact that they were relatives, Defendants did not select the Sankeys for adoption. Instead, Defendants selected the Andersons for adoption due to the color, race, and/or ethnicity of the Sankeys and the Children.

34.    While HHS was guardian of the Children, HHS failed to act in the Children's best interests by unreasonably failing to discharge their duties in finding a suitable adoptive home and by not complying with the internal procedures outlined in the "Adoption Permanent Placement Procedures," and state and federal law. HHS failed to act in the Children's best interests by irresponsibly, negligently, and recklessly discharging their duties in finding a suitable adoptive home for the children by ignoring expressed safety concerns about the selected family. HHS also failed to act in the children's best interests by irresponsibly, negligently, and recklessly discharging their duties by prioritizing the needs of the selected family over the needs of the Children.

35.    First, HHS's Employees' Manual unequivocally prohibits a Child's GAL and/or attorney from participating in the adoption selection committee's deliberation process. State of Iowa Department of Health and Human Services Employees' Manual Title 18, Chapter F(1), at 22 ("The child's GAL/attorney is not permitted to be part of the Department's Adoption Selection Committee Team Deliberation Process."). Ms. Linder was appointed as GAL to the children on April 3, 2023. The first time Ms. Linder met the children was on August 17, 2023, when she visited the home of Josh and Diana. During that visit, Ms. Linder talked with Josh and Diana about race being a predominant factor in adoptions. Ms. Linder indicated that she believed that for Children, it can be very important to feel like they belong with their family, "they have eyes, they can see, they can feel often very different from their family members if they look different from them." Despite the clear prohibition on Ms. Linder's participation in the Committee's deliberation process, Ms. Linder

actively participated in the Committee's deliberations. Ms. Linder participated in the nearly hour-long conversation that took place at the conclusion of the Committee's interviews. In sworn testimony, members of the Committee have testified that the real deliberations took place through individual conversations and an email exchange in the days following the interviews to which Ms. Linder was an active participant. Ms. Linder supplied the Committee copies of articles she had received from a conference she recently attended, she attached her interview notes for all to review, and she asked questions and requested additional follow up. This is not a situation in which Ms. Linder provided her input and was excused from the process. Ms. Linder was a full participant in the deliberation process.

36.    Second, Defendant Harms failed to provide the Sankeys with written notice of the selection decision within two business days of the notification. Despite being required to send placement to the notification to the family not selected within two business days of the date all parties were initially notified, Defendant Harms did not provide the required written notification to the Sankeys until November 7, 2023. Defendants have no explanation regarding the nearly two-month delay.

37.    Third, HHS failed to provide Mary Anderson's home study to the Committee's members five days prior to the interviews. The home study of Mary Anderson was provided to the Committee members on the day of the interviews, September 7, 2023. It was hand delivered to the Committee by Ms. Anderson. The home study was signed by Ms. Anderson and the Indiana Department of Child Services on the day of the interview.

38.    Fourth, HHS did not consult with the Social Work Supervisor, Amy Howell, regarding the adoption selection decision. Neither Defendant Harms nor any other Committee member sought Ms. Howell's input regarding adoption selection.

39.    Fifth, HHS failed to come to a consensus in choosing the adoptive family, as conclusively established through written documentation, including several emails, between the Committee members.

40.    Sixth, HHS failed to comply with and intentionally and deliberately violated the provisions of the Multiethnic Placement Act of 1994 (MEPA) and the Interethnic Adoption Provisions of 1996 (IEP) by considering race and color in the adoption placement selection.

41.    The obligation of HHS to follow the provisions of MEPA-IEP are clearly set forth in their Employees' Manual where it states:

> NOTE: **Race**, **color**, or **national origin** may not be routinely considered in adoption placement selections. To comply with the requirements of The Multiethnic Placement Act (MEPA) of 1994 and the Interethnic Adoption Provisions (IEP) of 1996 (MEPA-IEP), all placement decisions must be made as an individualized determination of each child's needs. Determine the proposed adoptive parent's capacity to care for a child based on an assessment of the child's needs.

HHS Employees' Manual, at 24 (emphasis in original).

42.    Despite the clear, established, and unambiguous requirements of MEPA-IEP and HHS's Employees' Manual, race and color were primary considerations in the adoption selection decision of the Children.

43.    During a meeting occurring after the adoption Committee interviews, the Committee agreed to get together again to talk about the adoption selection of the Children. Instead, however, the primary deliberations of the Committee were

comprised of emails exchanged between members of the Committee. The Committee made direct references to race and color in at least seven of the fifteen emails exchanged after the Committee's interviews.

44.    For example, Defendant James contacted a co-worker, Kelly Morgan, to get feedback and/or guidance regarding the adoption selection of the Children. Morgan sent an email to Defendant James on September 8, 2023. The email gave advice to Defendant James as to how to communicate with the other team members. Morgan stated that this would be "a great case for relatives to take up with the Court and for us to lose guardianship because we didn't do our job." Morgan encouraged Defendant James to make the "culture statement" too. She continued, asking, "Who in their circle is not white?

45.    In an email sent by Sara Linder, Ms. Linder attached articles she had received from a recent conference, one of which was entitled, "The Weaponization of Whiteness."

46.    In another email, Ms. James stated, "Finally, I worry about if the girls go with the Sankey's in LeClaire, where there are very few people of color (let's face it, that's a very upper-middle class white environment and a very white, wealthy school district) – how are the Sankey's going to introduce the girls to their culture? Who in the Sankey's circle is not white?" Ms. Linder posed the question, "Since I wasn't there, were the LeClaire Sankeys say anything about culture and race?"

47.    In addition, in various email exchanges between Defendant James and Defendant Harms, Defendant James suggested that Defendant Harms contact Mary for follow up conversations. Defendant James acknowledged that she never received

an answer to those questions. Defendant James also did not get answers to questions she had about the Sankeys and how diverse their community is and what exposure the Children would have to people of color if they were to be placed with them.

48.     Ms. James also spoke about her experiences working with Caucasian people who don't know very much about how to take care of the skin and hair of African-American children. She expressed concern about this several times.

49.     All members of the Committee and the Children's GAL deliberately used the race and/or ethnicity of the Children and the Sankeys throughout the adoption selection process. They each documented their use of race and/or ethnicity in writing, with no regard to applicable federal and state law and written policies of HHS. The Defendants' actions demonstrate HHS adopted and implemented an unwritten policy, custom, and practice of considering the race and ethnicity of children under HHS's supervision and prospective adoptive parents as a primary consideration in the adoption selection process, in violation of state and federal law.

50.     On or about April 3, 2024, following a contested hearing seeking removal of HHS as guardian of the Children due to HHS's irresponsible, negligent, and reckless actions in discharging their duties to the Children, the Iowa District Court for Johnson County held HHS violated MEPA-IEP. The Court stated:

> It is difficult to understand from the communication that is part of the record, how the Department can claim that race and color were not a primary consideration in their decision. The issue of culture is brought up both in the emails and in direct testimony. However, it is unclear how the different witnesses defined culture. There were references to skin and hair care. There were references to family history and ongoing family connections. Most, if not all, of the concerns for ongoing family contact were focused on contact with the biological

family, the family of the same race as the children. Ongoing contact with the adoptive side of the family was downplayed or not mentioned at all.

Some of the selection committee members were unable to articulate a reason for the selection of Mary. Some team members identified specific reasons, including that Mary is a nurse, she has a village of support to help raise her three children and the girls at issue in these cases, that Mary never gave up on Jayda and has a deep and meaningful connection to the family, and that Mary will not need day care for the children.

The Court is challenged to accept these stated reasons for the selection because of the apparent double standard used between Mary and Jake and Renee. For example, the fact that Mary works overnights, so she is home with the children, is viewed as a positive. The fact that Renee is a stay-at-home mom is negated. The fact that Mary has a "village" of support in her neighborhood rather than support an hour and a half away is viewed favorably. The fact that Renee's mother lives down the street from them, and the fact that Jake and Renee have been working together with Diana and Josh for the benefit of the girls for the past year and a half is discounted. Mary is viewed to have always been there and a support for Jayda while the Sankey's are viewed to have "given up on her." The Department believes that Mary "allowed Jayda space" and respected her decision to be adopted by Diana and Josh, while the Sankey's have abandoned her.

MEPA-IEP allows for the consideration of race and color in specific cases when there is a need related to a specific child. Those needs are to be clearly set forth and documented on a case-by-case basis. In these cases, there is no indication that such a specific need exists. The children are young. They are unable to state a preference as a teenage child might. The Department did not document or testify to any specific needs of any of the children that would warrant the necessity of a race-based decision. The only thing the Department put forward was an apparent preference for biological families over adoptive families.

Given the content of the communication amongst the team members and Sara Linder, and the inability of the Department to articulate any concrete or logical reason for the selection of Mary that is not based on race or color, the Court can reach no other conclusion other than the Department violated the provisions of MEPA-IEP.

51.    The conclusions of the Iowa District Court for Johnson County set forth in the foregoing paragraph are correct and accurate.

52.    Following the Court's April 3, 2024 Order, HHS did not challenge the Court's findings and did not appeal the decision. The Court's April 3, 2024 Order concluding HHS violated MEPA-IEP is a final judgment holding following a contested hearing is a valid and final judgment and is conclusive in this action.

53.    Based on the collective actions of Defendants, HHS was unreasonable and irresponsible in carrying out its duties during the adoption selection process involving the Children. The Defendants' conduct was so egregious that, in an Order dated April 3, 2024, the Iowa District Court for Johnson County held it was necessary and in the best interests of the Children to remove HHS as guardian of the Children.

54.    Following the Court's April 3, 2024 Order, HHS did not challenge the Court's findings and did not appeal the decision. The Court's April 3, 2024 Order concluding HHS acted unreasonably and irresponsibly in carrying out its duties to the Children such that removal of HHS as guardian of the Children was appropriate is a valid and final judgment and is conclusive in this action.

55.    Following removal of HHS as guardian of the Children, the Court entered an Order appointing the Sankeys as the Children's guardian.

56.    As a result of the removal of HHS as guardian of the Children due to HHS's unreasonable and irresponsible conduct, the Sankeys and the Children lost eligibility for substantial governmental benefits they would have received but for HHS's unreasonable and irresponsible conduct in violation of state and federal law.

57.    The actions of the Defendants in the adoption selection of the Children are inexcusable and violated clear, established, and unambiguous provisions of state and federal law and written policies and procedures of HHS. As a direct and

13

proximate result of the actions of the Defendants, Plaintiffs have suffered and continue to suffer damages, including, but not limited to, physical and mental pain and suffering arising from the abuse and maltreatment they endured while in their adoptive home in Indiana and substantial loss of governmental benefits that otherwise would have been available but for HHS's removal as guardian of the Children, including but not limited to costs for medical expenses and adoption subsidies.

<u>COUNT I</u>
**VIOLATION OF THE MULTIETHNIC PLACEMENT ACT OF 1994, AS AMENDED BY THE INTERETHNIC ADOPTION PROVISIONS OF 1996**
**(Asserted pursuant to 42 U.S.C. §§ 674, 1983, 1996b, against all Defendants)**

58.     Each and every allegation of the Complaint is incorporated herein as if fully set forth.

59.     An overriding goal of the Multiethnic Placement Act of 1994, as amended by the Interethnic Adoption Provisions of 1996 ("MEPA-IEP") is to prevent discrimination in placement decisions.

60.     MEPA-IEP provides, in relevant part, the following:

**(a) Requisite features of State plan**

In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which--

. . . .

**(18)** not later than January 1, 1997, provides that neither the State nor any other entity in the State that receives funds from the Federal Government and is involved in adoption or foster care placements may--

> **(A)** deny to any person the opportunity to become an adoptive or a foster parent, on the basis of the race, color, or national origin of the person, or of the child, involved; or

(B) delay or deny the placement of a child for adoption or into foster care, on the basis of the race, color, or national origin of the adoptive or foster parent, or the child, involved;

42 U.S.C. § 671(a)(18).

61.    MEPA-IEP further provides:

(1) Prohibited conduct

A person or government that is involved in adoption or foster care placements may not—

(A) deny to any individual the opportunity to become an adoptive or a foster parent, on the basis of the race, color, or national origin of the individual, or of the child, involved; or

(B) delay or deny the placement of a child for adoption or into foster care, on the basis of the race, color, or national origin of the adoptive or foster parent, or the child, involved.

(2) Enforcement

Noncompliance with paragraph (1) is deemed a violation of title VI of the Civil Rights Act of 1964.

42 U.S.C. § 1996b.

62.    Plaintiffs are individuals who have been "aggrieved by a violation of section 671(a)(18) by the State or other entity," and bring this action seeking relief. 42 U.S.C. 674(d)(3)(A).

63.    As a direct and proximate result of the Defendants' violation of MEPA-IEP, including through the joint conduct and civil conspiracy involving Defendant Linder and Johnson County, Iowa, Plaintiffs suffered damages and such damages include, but are not limited to, abuse and maltreatment in Mary Anderson's home, past and future physical and mental pain and suffering, past and future medical

expenses, loss of eligibility for government benefits, including costs of medical expenses and adoption subsidies, arising from HHS's removal as guardian of the Children, and other damages.

64.    The Defendants' violation of MEPA-IEP was intentional, deliberate, reckless, and constitute a conscious disregard of the Plaintiffs' rights warranting the imposition of punitive damages.

## COUNT II
## VIOLATION OF EQUAL PROTECTION UNDER THE UNITED STATES CONSTITUTION
### (Asserted pursuant to 42 U.S.C. § 1983 against all Defendants)

65.    Each and every allegation of the Complaint is incorporated herein as if fully set forth.

66.    The foregoing actions and inactions of Defendants in their official and individual capacities, constitute a failure to exercise an affirmative duty to all Plaintiffs, which is a substantial factor leading to, and proximate cause of, the violation of constitutionally protected interests of all of the Plaintiffs under the Equal Protection Clause of the United States Constitution, U.S. Const. amend. XIV.

67.    The foregoing actions and inactions of these Defendants constitute a policy, pattern, practice, and/or custom that is inconsistent with the exercise of reasonable professional judgment and amounts to deliberate indifference to the serious and constitutionally protected rights of all Plaintiffs.

68.    As a result, the Plaintiffs are being deprived of equal protection of the laws guaranteed by the United States Constitution.

69.     As a direct and proximate result of the Defendants' violation of the Equal Protection Clause of the United States Constitution, U.S. Const. amend. XIV, Plaintiffs suffered damages and such damages include, but are not limited to, abuse and maltreatment in Mary Anderson's home, past and future physical and mental pain and suffering, past and future medical expenses, loss of eligibility for government benefits, including costs of medical expenses and adoption subsidies, arising from HHS's removal as guardian of the Children, and other damages.

70.     The Defendants' violation of Plaintiffs' constitutional rights protected by the Equal Protection Clause of the United States Constitution was intentional, deliberate, reckless, and constitute a conscious disregard of the Plaintiffs' rights warranting the imposition of punitive damages.

## COUNT III
## DUE PROCESS UNDER THE UNITED STATES CONSTITUTION
### (Asserted pursuant to 42 U.S.C. § 1983 against all Defendants)

71.     Each and every allegation of the Complaint is incorporated herein as if fully set forth.

72.     The foregoing actions and inactions of Defendants in their official capacities, constitute a failure to exercise an affirmative duty to all Plaintiffs, which is a substantial factor leading to, and proximate cause of, the violation of constitutionally protected liberty and privacy interests of all of the Plaintiffs.

73.     The foregoing actions and inactions of these Defendants, including by and through the joint conduct and civil conspiracy involving Defendant Linder and Johnson County, Iowa, constitute a policy, pattern, practice, and/or custom that is inconsistent with the exercise of reasonable professional judgment and amounts to

deliberate indifference to the serious and constitutionally protected rights and liberty and privacy interests of all Plaintiffs.

74.    As a result, the Plaintiffs are being deprived of federally-created and state-created liberty or property rights without due process of law.

75.    As a direct and proximate result of the Defendants' violation of the Due Process Clause of the United States Constitution, U.S. Const. amend. XIV, Plaintiffs suffered damages and such damages include, but are not limited to, abuse and maltreatment in Mary Anderson's home, past and future physical and mental pain and suffering, past and future medical expenses, loss of eligibility for government benefits, including costs of medical expenses and adoption subsidies, arising from HHS's removal as guardian of the Children, and other damages.

76.    The Defendants' violation of Plaintiffs' constitutional rights protected by the Due Process Clause of the United States Constitution was intentional, deliberate, reckless, and constitute a conscious disregard of the Plaintiffs' rights warranting the imposition of punitive damages.

## COUNT IV
### BREACH OF FIDUCIARY DUTY
#### (by the Children against Defendants Linder and Johnson County)

77.    Each and every allegation of the Complaint is incorporated herein as if fully set forth.

78.    At all times material to this action, Defendants Linder and Johnson County, as guardian ad litem to the Children, owed fiduciary duties to the Children.

79.    At all times material to this action, Defendant Linder acted within the scope of her employment with Johnson County.

18

80.    The foregoing actions and inactions of Defendants constitute a breach of fiduciary duty to the Children.

81.    As a direct and proximate result of the Defendants Linder's and Johnson County's breach of their fiduciary duties to the Children, the Children suffered damages and such damages include, but are not limited to, abuse and maltreatment in Mary Anderson's home, past and future physical and mental pain and suffering, past and future medical expenses, loss of eligibility for government benefits, including costs of medical expenses and adoption subsidies, arising from HHS's removal as guardian of the Children, and other damages.

## COUNT V
## NEGLIGENCE
### (by the Children against Defendants Linder and Johnson County)

82.    Each and every allegation of the Complaint is incorporated herein as if fully set forth.

83.    At all times material to this action, Defendants Linder and Johnson County, as guardian ad litem to the Children, owed a duty to exercise reasonable care with respect to the Children.

84.    At all times material to this action, Defendant Linder acted within the scope of her employment with Johnson County.

85.    The actions of the Defendants were negligence and negligence per se, and such negligence includes, but is not limited to, actively participating in the adoption selection deliberation process with respect to the Children, promoting and actively encouraging the Committee's adoption selection process to use the Children's race, color, and/or ethnicity to base its adoption selection decision, negligent

supervision and training of Defendant Linder pertaining to her role as guardian ad litem of the Children, and other acts and omissions constituting negligence.

86.    As a direct and proximate result of the Defendants Linder's and Johnson County's negligence, the Children suffered damages and such damages include, but are not limited to, abuse and maltreatment in Mary Anderson's home, past and future physical and mental pain and suffering, past and future medical expenses, loss of eligibility for government benefits, including costs of medical expenses and adoption subsidies, arising from HHS's removal as guardian of the Children, and other damages.

**COUNT VI**
**DECLARATORY AND INJUNCTIVE RELIEF**
**(against all Defendants)**

87.    Each and every allegation of the Complaint is incorporated herein as if fully set forth.

88.    Defendants in performing the conduct complained of herein acted willfully and with intent to injure Plaintiffs.

89.    Defendants actions set forth above violate the equal protection and due process clauses of the Iowa Constitution. Iowa Const. art. I, §§ 6, 9.

90.    Defendants threaten to, and unless restrained, will continue to engage in the acts described herein.

91.    Accordingly, Plaintiffs seeks declaratory injunctive relief against Defendants in their official and individual capacities for their violation of state and federal law, as alleged above.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for the following relief:

a.      An award in an amount which will fully and fairly compensate Plaintiffs for the damages they sustained, including interest.

b.      An award of punitive and exemplary damages against Defendants.

c.      An award of all costs and attorneys' fees pursuant to any applicable statute or authority;

d.      A declaration, order, and judgment holding that Defendants violated the Multiethnic Placement Act of 1994, as amended by the Interethnic Adoption Provisions of 1996.

e.      A declaration, order, and judgment holding that Defendants violated the Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution and article I, section 6 of the Iowa Constitution.

f.      A declaration, order, and judgment holding that Defendants violated the Due Process Clauses of the Fourteenth Amendment to the United States Constitution and article I, section 9 of the Iowa Constitution.

g.      A declaration, order, and judgment holding that Defendants violated their fiduciary duties to Plaintiffs.

h.      A declaration, order, and judgment holding that Defendants' conduct constitutes negligence in the performance of their duties to Plaintiffs.

i.      A permanent injunction requiring Defendants to cease any policy, practice, custom, and conduct in violation Multiethnic Placement Act of 1994, as amended by the Interethnic Adoption Provisions of 1996, the Equal Protection

21

Clauses of the Fourteenth Amendment to the United States Constitution and article I, section 6 of the Iowa Constitution, the Due Process Clauses of the Fourteenth Amendment to the United States Constitution and article I, section 9 of the Iowa Constitution, and Iowa common law.

j.      Grant other such relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs request a trial by jury on all issues properly triable thereto.

Dated: July 18, 2025                    Respectfully submitted,

/s/ *Scott M. Wadding*
Scott M. Wadding AT0010447
SEASE & WADDING
104 SW Fourth Street, Suite A
Des Moines, Iowa 50309
Telephone: (515) 883-2222
Facsimile: (515) 883-2233
swadding@seasewadding.com

*Attorneys for Plaintiffs*